**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN THE MATTER OF SIGNAL** | § | |
| **INTERNATIONAL, LLC,** | § | |
| **Petitioning for Exoneration from or** | § | **Civil Action No. 1:05CV477-LG-RHW** |
| **Limitation of Liability** | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON ISSUES TRIED
WITHOUT A JURY PURSUANT TO FED. R. CIV. P. 52**

THIS CAUSE came before the Court on March 24, 2008, for trial without a jury.  In this matter, Signal International, LLC, is seeking exoneration from or limitation of liability pursuant to 46 U.S.C. § 181 *et seq.*[1]  This limitation of liability action arises out of an incident in which two barges owned by Signal struck the Interstate 10 bridge near Pascagoula, Mississippi.  The allision occurred during Hurricane Katrina.  After careful consideration of the testimony presented at trial and the exhibits introduced into evidence, the Court finds that Signal is not entitled to exoneration from liability but is entitled to limitation of liability.  The Mississippi Department of Transportation (MDOT) is entitled to a judgment against Signal in the amount of $1,533,400.

**FINDINGS OF FACT**

Signal, a marine fabrication and repair company, owns two facilities in Pascagoula, Mississippi: the East Yard, which is located on the Bayou Casotte, and the West Yard, which is located on the Pascagoula River.  (Tr. at 40, li. 8-15).  In August of 2005, Signal owned two ringer crane barges – the D/B *Mr. T* and the D/B *Miss Tiff* – that it used to work on the water side of rigs.  (Tr. at 40, li. 13 - 41, li 4).  Signal also owned a smaller, steel deck barge named the D/B

---

[1] Effective October 6, 2006, 46 U.S.C. § 181 et seq. was repealed and supplanted by 46 U.S.C. § 30503.  Signal's Complaint for Exoneration from or Limitation of Liability was filed on October 28, 2005.

*Jack King*.  (Signal Ex. 1).

Signal's hurricane plan contained five "alert conditions," which are also used by the Coast Guard and the Port of Pascagoula.  (Tr. at p. 248, li. 4-12; p. 254, li. 9-12).  The two alert conditions that are relevant in this case are Alert Condition 5, which provides that Signal should review, update and revise the hurricane plan and ensure that weather reports are received regularly throughout the hurricane season, and Alert Condition 4, which is triggered when there is a possibility of a hurricane strike within seventy-two hours.  (Signal Ex. 10-004).  Condition 4 provides that a meeting should be held to discuss preparations and that Signal should begin preparing its facilities, property, and equipment for the approaching storm.  At this Condition, Signal removes the crane booms from its ringer crane barges and lays the masts down.  (Tr. at 89, 14-21).  According to Signal's expert, Alfonso Sotres, this must be done because the booms have a very large wind sail area and may strike other objects.[2]  (Dep. of Sotres, Day 1, p. 91, line 21-p. 92, li.7).  Pursuant to the plan, the ringer crane barges "may be moved upriver and secured with the barge spuds, or other suitable moorings."  (Signal Ex. 10-007).  Other suitable moorings include wire rope, anchors, and nylon rope.  (Tr. at 419, li. 17-22).

In order to monitor weather conditions and approaching hurricanes, Signal had entered into a contract with ImpactWeather several years prior to Hurricane Katrina.  (Tr. at 76, lines 11-16).  ImpactWeather's reports are specific to Pascagoula, Mississippi.  (Tr. at 76, li. 17-19).

---

[2] MDOT filed a Motion in Limine [47] seeking to strike Sotres' proposed testimony because MDOT contends that Signal did not designate him as an expert by the deadline imposed by the Court.  However, the Court finds that Sotres' testimony does not assist Signal in demonstrating that it is entitled to exoneration from liability, and MDOT had a full opportunity to depose him.  Additionally, the Court notes that MDOT's Motion was untimely.  *See Uniform Local Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi* 7.2(B)(3); 26.1(A)(3).

Tropical Depression Twelve, which eventually became known as "Hurricane Katrina," formed on Tuesday, August 23, 2005, over the southern Bahamas. (Tr. at 291, 8-11). ImpactWeather Advisory 1 concerning Katrina was issued at approximately 4:00 p.m. on August 23, 2005, and forecasted that the storm would travel to the northwest toward southeastern Florida in forty-eight hours, then move westward across the southern Florida peninsula and into the eastern Gulf of Mexico in a little more than three days. It forecasted a second landfall anywhere along the Gulf Coast from Texas to Florida. Advisories 2 through 5 expressed uncertainty regarding the expected track of Katrina after it crossed the Florida peninsula. Advisories 6 through 8, which were issued on Wednesday, August 24, 2005, and Thursday, August 25, 2005, forecasted that Katrina's second landfall would take place on the Florida panhandle. (Signal Ex. 21-011-016). Katrina became a tropical storm and made its first landfall in southeastern Florida on August 25, 2005. (Tr. at 291, li. 12-14; Signal Ex. 21-019). Advisory 9, which was issued on August 25th, once again predicted that the second landfall would take place in Florida but noted that stronger high pressure could cause the storm to move as far west as southeastern Louisiana or Mississippi. (Signal Ex. 21-018). Advisory 10 did not change the forecast for the second landfall but stated: "One thing does seem likely: Katrina will more than likely be a major hurricane before its next landfall." (Signal Ex. 21-020). Katrina moved into the southeastern Gulf of Mexico on August 26, 2005. (Tr. at 291, li. 12-14). Advisory 13, issued on that same day, predicted that the storm would strike just east of Pensacola, Florida, with sustained winds of 120 miles per hour.[3] (Signal Ex. 21-025). Advisory 14, which was also issued on August 26th,

---

[3] Advisory 11 contained no change in the forecast, and Advisory 12 was not available and not entered into evidence at trial. (Signal Ex. 21-021, 022, 023).

noted that some models were predicting that the storm could strike in southeast Louisiana or Mississippi, but ImpactWeather still believed that the storm would not strike that far west. (Signal Ex. 21-026).  ImpactWeather predicted that the sustained winds could reach 125 to 135 miles per hour and that the storm could produce a twelve to fifteen foot storm surge upon landfall.  (Signal Ex. 21-026).  This advisory was the first and only advisory that specifically forecasted the possibility of hurricane force winds in Pascagoula, Mississippi.  (Tr. 305, 1-11; 309, 6-17).  Advisory 15, which was issued at 8:33 p.m. on August 26th, predicted that the storm would strike near the mouth of the Mississippi River.  (Signal Ex. 21-028).  At 9:00 p.m. on August 26, 2005, Signal was informed that the second landfall would take place near Grand Isle, Louisiana, between mid-morning and early afternoon on Monday, August 29, 2005.  (Signal Ex. 21-030).  At 3:00 a.m. on August 27, 2005, Signal was informed that Katrina was expected to strike as a Category 4 hurricane.  (Signal Ex. 21-037).  Nevertheless, Signal's expert meteorologist testified that the maximum winds that were forecasted by ImpactWeather for Signal's yards on Saturday and Sunday was fifty-eight miles per hour and the maximum storm surge predicted was to be three to six feet.  (Tr. at 309, li. 18-20).

Signal held its seventy-two hour meeting on Friday, August 26, 2005.  (Tr. at 426, li. 11-15).  The ringer crane barges, *Mr. T* and *Miss Tiff*, were used to secure the rigs that were in Signal's yard on Friday evening, August 26, 2005.  (Tr. at 537, li. 8-12).  The barges were then prepared for transport to the mooring site on Friday night and Saturday morning.  (Tr. at 538, li. 5-13).  *Miss Tiff* had on board a Manitowoc 4100W Series 2 ringer crane.  (Signal Ex. 31; Tr. at

-4-

537, li. 12 - 538, li.1).  The spud motor[4] on the *Miss Tiff* had stopped working "a couple of

weeks" before the storm,[5] and therefore a Manitowoc 4100W crawler crane was driven onto the

deck of the smaller barge, the *Jack King*, to assist in lifting *Miss Tiff*'s spuds.  (Tr. at 459, li. 21-

460, li. 1; 458, li. 23 - 459, li. 2).  Before being transported up the Pascagoula River to the

mooring site, the *Miss Tiff* was tied to the *Jack King*.

As the barges attempted to travel underneath the CSX railroad bridge on the Pascagoula

River, *Miss Tiff* 's spuds struck a fiberoptic cable.[6]  (Tr. at 540, li. 10-23).  Signal contends that

the cable was supposed to be underground but had somehow become exposed.  (Tr. at 540, li. 22-

25).  As a result, Signal was forced to take the barges back to Signal's Pascagoula River yard so

that *Miss Tiff* 's spuds could be removed.  (Tr. at 541, li. 5-24).  Signal determined that it would

tie the *Miss Tiff* to the *Mr. T*, which was spudded down at the mooring site.  (Tr. at 541, li. 22 -

542, li. 2).  The mooring site, which is 2.5 miles north of the Mississippi Sound, is a sheltered

_____

[4]Spuds are eighty to ninety foot pipes that are dropped through wells in the barges.  (Tr. at 740, 1-5).  The spuds weigh eight to ten tons, so they penetrate the bottom of the river approximately ten feet when they are dropped.  (Tr. at 406, li. 19-22).  The spud motor is used to lift the heavy spuds so that they can be dropped into place.  The ringer cranes that are on the crane barges can also be used to lift the spuds when the motor is not working, but the cranes are disassembled in preparation for the hurricane.  (Tr. at 457, li. 14-458, li.4).

[5] Spuds are not absolutely necessary, and problems with the spud motor do not prevent the barges from performing their usual work in the yard or from being moored.  (Tr. at 532, li. 19-22).  Signal's production manager at the time of the storm, Bill Bingle, testified that Signal was probably waiting on a part for the motor when the hurricane struck.  (Tr. at 441, li. 8-11).  However, there are no repair records or records concerning the purchase of parts in evidence.  Additionally, Signal's employees were not able to remember very much concerning the problem with the spud motor.

[6] The spuds were pinned in place, as high as possible, for transport, since the spud motor was not operational and the ringer crane boom had been removed for transport and mooring.  (Tr. at 469, li. 22-25; 470, li. 4-7).

area that is surrounded by marshland.  (Tr. at 536, li. 17-25; 289, li. 24-290, li. 4).

The rigging department manager, William Tanner, instructed the rigging crew on how to arrange and tie the barges.  (Tr. at 542, li. 3-6).  Signal's Exhibit 18, which was drawn after the storm by Gene Rice[7] shows the manner in which the barges were arranged and tied.  (Tr. at 355, li. 12-16; 736, li. 1-6).  The sterns of *Mr. T* and *Miss Tiff* each faced south.  (Signal Ex. 18; Tr. at 758, li. 7-17).  One of *Miss Tiff*'s wing barges or buoyancy barges, which was located on the starboard side near her stern, was interlocked behind the stern of the *Mr. T*, and the *Jack King* was tied to the *Miss Tiff*.[8]  (Ex. 18; Tr. at 735, 15-20).  The *Jack King* and the *Miss Tiff* were tied together with two six-part lines at their corner bits.[9]  (Tr. at 619, li. 15-25; 738, li. 11-17).  A small island was on the east side of Mr. T, while *Miss Tiff* and *Jack King* were on the west side of *Mr. T*.  (Ex. 18; Tr. at 758, li. 18-25).  Rice testified that he approved the mooring plan and inspected the moorings for the rigs in Signal's possession prior to the storm, but he did not approve the mooring plan or inspect the mooring arrangement for the barges.  (Tr. at 343, li. 13 - 344, li. 13).  Additionally, Tanner testified that he did not consult with Signal's engineering department prior to the storm in order to determine whether the mooring arrangement would survive the hurricane.  (Tr. at 560, li. 24 - 561, li. 25).

A team of riggers added two additional lines to the flotilla on the day before the storm. (Tr. at 742, li. 6-14).  Also at that time, all of the slack was let out of the spud winches so that the

---

[7] Rice is Signal's engineering and emergency preparedness manager

[8] It is unclear whether the stern of the Jack King was tied to the bow of the Miss Tiff, or whether the barges were tied bow to bow.  (Tr. at 383, li. 2 - 384, li. 4).

[9] Exhibit 18 is incorrect in this respect because the lines on Exhibit 18 appear to go to the center of the barges.  (Tr. at 738, li. 11-17).

flotilla of barges could rise and fall as the water levels increased and decreased during the storm. (Tr. at 740, li. 1-19).  All of the lines used in the mooring arrangement were two-inch eight-braid nylon rope.  (Tr. at 542, li. 25 - 543, li. 2).

The storm reached Category 5 wind speeds on Sunday, August 28, 2005, with maximum sustained winds of 170 miles per hour. (Tr. at 291, li. 23 - 292, li. 3).  However, it began to weaken during the final twelve hours prior to landfall.  (Signal Ex. 24-003).  It was a strong Category 3 storm with sustained winds of 127 miles per hour when it made its second landfall just south of Empire/Buras, Louisiana, sixty miles west of the mooring site.  (Signal Ex. 24-003, 24-011).  The time of landfall was between 5:45 a.m. and 6:10 a.m. on Monday, August 29, 2005.  (*Id.*)  Although Katrina was a strong Category 3 storm, it produced storm surge that normally would only be expected with a Category 5 storm.  (Signal Ex. 24-004).  In the opinion of Signal's meteorological expert, Nash Roberts, Katrina was the most severe system to hit in the Gulf of Mexico, and financially, it caused the greatest damage of any hurricane in United States' history.  (Tr. at 290, 18-24).  The storm surge was unprecedented in height and distance.  (Tr. at 290, li. 25-291, li.3).  According to Roberts, the mooring site experienced eighty to ninety mile per hour sustained winds, with gusts of 100 to 110 miles per hour.  (Tr. at 311, li. 6-13). Therefore, the barges were subjected to Category 1 winds.  (Tr. at 312, li. 17-19).  The storm surge experienced at the mooring site was between fourteen and sixteen feet, and the waves were approximately two feet tall.  (Tr. at 312, 4-12; Tr. at 322, li. 20-21).

After the hurricane, *Jack King* and *Miss Tiff* were found adjacent to the Interstate 10 bridge, sitting on marshland.  (Tr. at 442, li. 1-6; 442, li. 20-23).  The bridge is located approximately 4.7 miles from the mooring site.  (Tr. at 663, li. 8-12).  When the barges struck the

bridge, the eastbound lanes of the bridge were displaced by approximately four to five feet. (Tr. at 768, li. 2-14).  Only one of the mooring bits on the barges was damaged, but there were frayed ropes "everywhere."  (Tr. at 407, li. 14-23; 657, li. 22).  The ropes were not saved for purposes of this litigation.  (Tr. at 172, li. 5-13; 898, li. 18-21).  Signal's expert marine surveyor, Michael Schiehl, determined that the surge was between six and eight feet when the barges struck the bridge.  (MDOT Ex. 8).  Signal's engineer, Rice, calculated that the nylon ropes holding the barges together had a breaking strength of 456.5 short tons, while he estimated that the force necessary to hold the barges during the storm, assuming 155 mile per hour winds and eighteen foot storm surge, would have been 228.27 short tons.  (Ex. 18; Tr. at 360, li. 11-12; 361, li. 1-4). Therefore, he determined that the barges should not have broken free.  (Ex. 18; Tr. at 361, li. 25-362, li. 2).  Signal's naval architect, Alfonso Sotres, also determined that the moorings used were reasonable to withstand the wind forces of a hurricane and that the mooring arrangement should have been sufficient to withstand the wind forces in the location where the barges were moored. (Sotres Dep., Day 1, pp. 122-127).  Sotres did not consider the storm surge in his calculations because, in his opinion, the surge should not have affected the barges due to the fact that the barges float up with the rising waters.  (Sotres Dep., Day 1, pp. 133-137).   Sotres also opined that the barges were in protected, shallow waters where the waves would have had a small fetch.[10]  (Sotres Dep., Day 2, pp. 15-16).  Therefore, the waves would have been short during the storm and would not have caused the barges to roll and pitch.  (*Id.*)

However, MDOT's marine surveyor, Chander Gorowara, opined that the working load limit of the ropes, not the breaking strength, should be considered when determining the number

---

[10] "Fetch" is the distance traveled by waves without obstruction.

of ropes needed to tie the vessel.  (Tr. at 880, li. 21 - 881, li. 6).  Gorowara explained that the

breaking strength of rope should only be used to determine whether the rope will break the bits or

bollards to which they are tied.  (Tr. at 883, li. 15 - 884, li. 19).  He testified that the working load

limit is utilized to determine how many lines to put on a vessel.  (Tr. at 884, li. 20-25).

Gorowara stated that eleven lines were used to moor the vessels, and in his opinion, that was

insufficient because the working load limit of those lines would be 38.77 short tons.  (Tr. 882, li.

7-9).  Sotres asserted that the number of lines Gorowara suggested should have been placed on

the barges "would not be practical to physically install."  (Sotres Dep., Day 1, p. 148).

       MDOT invited certain contractors to place bids to perform the repairs to the bridge.  (Tr.

at 930, li. 3-6).  According to MDOT, the lowest responsive bid was submitted by TL Wallace

Construction.  (Signal Ex. 74-051).  Wallace received a $1,000,000 bonus completing the project

ten days early and was paid a total of $6,268,191.  (Tr. at 1030, li. 6-15).  The cost of repairing

the bridge was reimbursed by the federal government.  (Tr. at 917, li. 5 - 918, li. 16).  Any funds

that MDOT recovers in this lawsuit will be credited back to the federal government.  (Tr. at 918,

li. 17-25).

## CONCLUSIONS OF LAW

Real Party in Interest

       Signal asserts that MDOT is not the real party in interest in this lawsuit because the

repairs to the bridge were reimbursed by the federal government.  Signal did not file a Motion to

Dismiss on these grounds but asserted the argument for the first time at trial.  Rule 17 of the

*Federal Rules of Civil Procedure* provides that an action must be prosecuted in the name of the

real party in interest.  A court cannot "dismiss an action for failure to prosecute in the name of

the real party in interest until, after an objection, a reasonable time has been allowed to ratify,

join, or be substituted into the action." FED. R. CIV. P. 17(a)(3).

> Consistent with this language requiring an opportunity for joinder of the real
> parties in interest, the defense is waived when it is not timely asserted . . . .
> The objection must be raised when joinder is timely and convenient. "The
> earlier the defense is raised, the more likely that the high cost of trial
> preparation for both parties can be avoided if a real party in interest question is
> determined adversely to a plaintiff." Thus, the goal of judicial efficiency is
> furthered.

*Rogers v. Samedan Oil Corp.*, 308 F.3d 477, 483 (5th Cir. 2002). Therefore, Signal waived its

defense by asserting it for the first time at trial.

<u>Exoneration from Liability</u>

"Liability in collision and allision[11] cases has always been apportioned based on fault."

*Fischer v. S/Y Neraida*, 508 F.3d 586, 593 (11th Cir. 2007) (citing 2 Thomas J. Schoenbaum,

*Admiralty and Maritime Law* 89 (4th ed. 2004)). However, since evidence of fault is often in the

exclusive control of the defendant in a collision case, several presumptions similar to the doctrine

of *res ipsa loquitor* have been adopted to shift the burden of presumption and persuasion to the

defendant. *Fischer*, 508 F.3d at 593 (citing 2 Schoenbaum, *supra*, at 105). One of these

doctrines, the Louisiana Rule, provides that when a drifting vessel, propelled by current or wind,

strikes a stationary object, the owner of the moving vessel is presumptively liable for the

damages caused to the stationary object. *Pet. of the United States v. Steamship Joseph Lykes*,

425 F.2d 991, 995 (5th Cir. 1970); *see also The Louisiana*, 70 U.S. 164, 173 (1866). The

presumption must be rebutted by demonstrating by a preponderance of the evidence that (1) the

---

[11] An allision occurs when a moving vessel strikes a stationary object, while a collision
occurs when a moving vessel strikes another moving vessel. *Fischer*, 508 F.3d at 589 n.1.

allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable

care; or (3) that the allision was "the result of an inevitable accident, or a *vis major*, that human

skill and precaution and a proper display of nautical skill could not have prevented." *Bunge*

*Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 923 (11th Cir. 2001); *Pet. of the United*

*States*, 425 F.2d at 995.

      In the present lawsuit, the allision clearly was not the fault of MDOT or its bridge.

Therefore, the Court must consider whether the allision was the result of an inevitable accident or

*vis major* and whether Signal acted with reasonable care.

      The Act of God defense is an argument of superseding causation. *Fischer*, 508 F.3d at

595.   "The burden of proving an inevitable accident or Act of God rests heavily upon the vessel

asserting such defense." *Bunge Corp.*, 240 F.3d at 926 (quoting *Boudoin v. J. Ray McDermott &*

*Co.*, 281 F.2d 81, 88 (5th Cir. 1960)).   "An 'Act of God' will insulate a defendant from liability

only if there is no contributing human negligence ." *John W. Stone Oil Distrib., LLC v. Bollinger*

*Shipyards, Inc.*, 2007 W.L. 2710809 at *6 (E.D. La. Sept. 12, 2007).

      In *Bunge*, the Eleventh Circuit held that Hurricane Opal did not absolve the owner of a

casino vessel from fault where the vessel was subjected to sustained winds between 85 miles per

hour and 103.5 miles per hour. *Bunge*, 240 F.3d at 926.   The Court explained that the winds

were not of such force that no reasonable preparations would have prevented the vessel from

breaking free from her moorings. *Id.*

      Signal relies on a 1971 decision in which the Mississippi District Court held that

Hurricane Camille was the sole proximate cause of damage caused by three vessels to the Port of

Gulfport. *See In re Compl. & Pet. of Int'l Marine Dev. Corp.*, 328 F. Supp. 1316, 1329-30 (D.C.

Miss. 1971).  However, the Court found that Hurricane Camille involved wind speeds of 200 miles per hour, a tide rise of thirty feet or more, and a tidal surge of at least twenty-two feet. *Inter'l Marine Dev.*, 328 F. Supp. at 1330.

Signal also asserts that it did not have sufficient time and warning to prepare for Hurricane Katrina, relying on *Skandia Ins. Co. v. Star Shipping AS*, 173 F. Supp. 2d 1228 (S.D. Ala. 2001).  In *Skandia*, the Court held that the defendant did not have sufficient notice of the flood risk associated with Hurricane Georges where the weather forecasts were constantly changing prior to the storm and the defendant did not have any knowledge that the area had flooded before.  *Skandia*, 173 F. Supp. 2d at 1252.  The Court explained:

> [I]f a defendant has sufficient warning and reasonable means to take proper action to guard against, prevent, or mitigate the dangers posed by the hurricane but fails to do so, then the defendant is responsible for the loss; however, if there were insufficient warnings or insufficient means available to the defendant to protect the cargo from the "Act of God," then they are not responsible for the loss.

*Id.* at 1241.

If the present case had involved a location that experienced the full force of Hurricane Katrina, it could be considered a storm so catastrophic that no reasonable preparations would have prevented the allision.  However, at the mooring location, the wind speeds were eighty to ninety miles per hour, and the waves were only approximately two feet tall.  The storm surge was fourteen to sixteen feet, but Signal's own expert, Sotres, testified that surge was not a factor that should have affected the barges.  As a result, Signal has not demonstrated that Katrina, in this location, was a storm so catastrophic that no reasonable preparations would have prevented the allision.

Furthermore, Signal has not demonstrated that the conditions experienced were not

foreseeable.  Signal was repeatedly warned by ImpactWeather that Katrina would be a very

dangerous storm with winds far exceeding one hundred miles per hour.  Additionally, the

forecasts predicted landfall anywhere from southeast Louisiana to the Florida panhandle.  Signal

even claims that it prepared for a Category 4 storm, while the wind conditions experienced by the

barges were Category 1 wind speeds.  Thus, the conditions experienced by the barges were

foreseeable to Signal.[12]  Therefore, the Court finds that Hurricane Katrina, at the mooring site,

was not an Act of God of such catastrophic proportions that no reasonable preparations would

have prevented the allision.[13]  Therefore, the Court will consider whether Signal has rebutted the

presumption of fault by proving by a preponderance of the evidence that it acted with reasonable

care when mooring the vessels:

> "[T]he test for determining whether [defendants] were free from fault is
> whether they took reasonable precautions under the circumstances as known
> or reasonably to be anticipated."  Applied to the context of hurricane

---

[12]  Signal asserts that MDOT's damages were not foreseeable pursuant to a recent
unreported decision, *In Re: Dredging Limitation Actions Consol. Litig.*, Civil Action No. 06-
8676 (E.D.L.A. June 12, 2008).  However, the Court finds that the *Dredging* case does not
support such a determination because it pertained to the damages suffered by numerous residents
of New Orleans when the levees broke after Hurricane Katrina.  It was asserted in *Dredging* that
the levee breach was caused by dredging that was performed by several companies over a period
of many years.  The claimants in the *Dredging* case did not assert that any property owned by the
dredging companies struck the levee.  In the present case, the damages caused were foreseeable
in that MDOT was within the class of those for which damage would be expected if barges
moored on the Pascagoula River broke free during a hurricane, i.e. those owning property near
the Pascagoula River.  *See Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th
Cir. 1987).

[13]  The Court recognizes that Hurricane Katrina was a horrific, unprecedented storm.
However, this Court must look at the conditions that were experienced at the mooring site and
the proof presented by Signal at trial.  Therefore, the holding in this case is limited to the facts,
evidence, and location at issue in this case.

> preparations, reasonable care amounts to whether the owner "use[d] all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane." Although what "reasonable care" requires changes with the circumstances, that standard recognizes the existence in every case of something more that could be done - and perhaps would be legally required under a "highest degree of caution" standard - but that reasonable care does not demand.

*Fischer v. S/Y Neraida*, 508 F.3d 586, 594 (11th Cir. 2007) (citations omitted) (quoting *Pet. of the United States*, 425 F.2d 991, 995 (5th Cir. 1970); *Stuart Cay Marina v. M/V Special Delivery*, 510 F. Supp. 2d 1063, 1072 (S.D. Fla. 2007)).

Here, the fact finding is handicapped by the lack of physical evidence.  Signal threw away the mooring ropes, so no testing was done.  The photographs presented by Signal at trial did not provide a good view of the bits to which the ropes were tied or of the ropes themselves.  In addition, none of the individuals who initially moored the barges were produced as witnesses at trial, and only one witness who saw the final mooring arrangement testified at trial, after Signal was allowed, over objection, to reopen its case in chief.

Signal presented testimony from its engineer, Gene Rice, and its naval architect, Sotres, that the moorings should have withstood a much stronger storm if they were tied in the manner indicated by Signal employees.  However, it is undisputed that the ropes did not withstand the storm.  In fact, Signal's marine surveyor, who inspected the allision scene, testified that the site of impact indicated that the barges struck the bridge at a time when the surge was only six to eight feet.  Only one of the eleven lines tied by Signal's employees withstood the storm, and frayed ropes were found all over the barges at the allision site.

Finally, there is the question of the inoperative spud motor.  Although Signal employees, including its production manager, Bill Bingle, and its rigging department manager, William

Tanner, were aware that the spud motor was not functioning on the *Miss Tiff* for a few weeks

prior to Hurricane Katrina, Signal did not develop or test a plan for mooring the vessels without

the use of the spuds.[14]  Thus, it appears that Signal improvised, and decided to employ an

untested method for mooring *Miss Tiff* as Hurricane Katrina approached.  The Court recognizes

that Signal's plan contemplated the use of mooring methods other than spudding the vessels, but

there is no evidence that Signal had spent any time, conducted any calculations, or performed any

tests prior to the storm in order to develop a reasonably secure method of mooring the *Miss Tiff*.

Finally, although there was a large amount of debris propelled by wind during Hurricane Katrina,

there is no indication that flying debris or other loose vessel caused the barges to break free.  In

sum, it is the opinion of the Court that Signal has not met its burden of demonstrating that it

acted with reasonable care when mooring its barges and that it has failed to rebut the

presumption of liability for the allision with the Interstate 10 bridge in Pascagoula, Mississippi.

Limitation of Liability

        The Limitation of Liability Act provides that a vessel owner's liability for certain claims

may be limited to the value of the owner's interest in the vessel at the termination of the voyage

and the freight monies earned by the vessel owner during the voyage.  *See* 46 U.S.C. §181 *et seq*.

Once a claimant proves that negligence or unseaworthiness caused an accident, an owner seeking

limitation must show that it lacked privity or knowledge of the condition.  *In the Matter of the*

*Libel and Pet. of Kristie Leigh Enters., Inc.*, 72 F.3d 479, 481 (5th Cir. 1996).  As explained

*supra*, there is a presumption of negligence in the present lawsuit because the barges struck a

---

        [14] The testimony presented by Signal regarding the amount of time that the spud motor
was broken and the possible problems in obtaining parts needed to repair it was very uncertain
and inexact.

stationary object, and Signal has failed to rebut that presumption of negligence.  Therefore, the Court must determine whether Signal had knowledge or privity of the conditions that caused the allision.

The burden of proof is on the shipowner to prove lack of privity or knowledge of the negligent or unseaworthy condition.  *Verdin v. C & B Boat Co., Inc.* 860 F.2d 150, 156 (5th Cir. 1988); *In re Complaint of Patton-Tully Trans. Co.,* 797 F.2d 206, 211 (5th Cir.1986).  Privity or knowledge extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation.  *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993).  "A corporation is prevented from limiting its liability by the act of a managing agent when "the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred . . . ."  *Cont'l Oil Corp. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983) (*Coryell v. Phipps (The Seminole)*, 317 U.S. 406, 410-11 (1943)).  Since a corporation operates by and through individuals, the privity and knowledge of individuals at a certain level of responsibility is deemed to be the privity and knowledge of the corporation.  *Cont'l Oil Corp.*, 706 F.2d at 1376.  It is the "extent of an employee's responsibility, not his title, [that] determines whether limitation is foreclosed."  *In re Hellenic Inc.*, 252 F.3d 391, 396 (5th Cir. 2001).  This is a case-specific determination, but the following non-exhaustive list of factors is commonly used to determine whether an employee is a managing agent: (1) the scope of the agent's authority over day-to-day activity in the relevant field of operations; (2) the relative significance of this field of operations to the business of the corporation; (3) the agent's ability to hire or fire other employees; (4) his power to negotiate and enter into contracts on behalf of the company; (5) his

authority to set prices; (6) the agent's authority over the payment of expenses; (7) whether the agent's salary is fixed or contingent; and (8) the duration of his authority. *Hellenic Inc.*, 252 F.3d at 397.

There are a few Fifth Circuit cases that are instructive on this issue. First, in *Bonanza Corp.*, the Court held that Bonanza was not entitled to limit its liability. *Bonanza Corp.*, 706 F.2d at 1377. Conoco chartered a vessel owned by Bonanza to assist with its drilling operations in the Gulf of Mexico, but it sank beneath the rig due to the negligence of Bonanza's captain and deckhand. *Id.* at 1367. Conoco sued Bonanza seeking the cost of removing the sunken vessel. *Id.* The boat's captain, whose negligence caused the incident, arranged all scuba diving charters but was required to obtain approval for other charters. *Id.* at 1375. The captain decided what purchases and repairs to make and when to make the repairs. *Id.* He had authority to hire the boat crew on a per trip basis. *Id.* The boat captain was essentially in charge of the company's entire maritime venture, and he was paid from the boat's profits rather than a fixed salary. *Id.* at 1376. The Court held, "Although Freeman was neither a shareholder nor an officer of the close corporation, Fuller granted him so much autonomy in the management of the vessel that the district court did not err in attributing Freeman's privity and knowledge to the corporation." *Id.* at 1377.

However, in *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346 (5th Cir. 1993), the Court held that a toolpusher who supervised a drilling rig where a derrickman was injured was not a managing agent. *Cupit*, 1 F.3d at 349. The derrickman was injured when a fill-up line blew. *Id.* at 347. The toolpusher, who knew that an unsafe method was used to bleed off pressure through the fill-up line, had the authority to control every operation on the rig as long as

the rig was stationary and drilling.  *Id.* at 348.  However, there were nine other toolpushers who had equal authority over the company's nine other rigs.  *Id.*  The toolpusher had no authority over where or when the next drilling job would take place, and he had no authority over basic business decisions, which were made by the drilling supervisors and the president of the company.  *Id.* Therefore, the Court held that the toolpusher's role and scope of authority were too limited, such that his knowledge could not be attributed to the company.  *Id.* at 349.

In *Hellenic Inc.*, the owner of a spud barge that struck and ruptured a natural gas pipeline sought limitation of liability.  *Hellenic Inc.*, 252 F.3d at 393.  Dana Lee, a construction superintendent, made the decision to leave the barge unmanned and anchored by its spuds overnight.  *Id.*  Lee was not authorized to make business decisions on behalf of the company.  *Id.* He could not execute contracts, set prices, or hire and fire employees.  He did not have any administrative responsibilities.  *Id.*  Nevertheless, he had the authority to decide whether and under what circumstances the barge would remain in the field overnight, and he supervised the construction project.  *Id.*  He also supervised four vessels.  *Id.* at 398.  The Court held that the construction superintendent was not a managing agent because he could not make basic business decisions, and therefore the company was entitled to limitation of liability.  *Id.*

The pertinent facts in this case are that, in August of 2005, Ronald Schnoor was the Senior Vice President and General Manager for Signal's Mississippi Operation.  (Tr. at 38, li. 4-5).  Mr. Schnoor reported to the CEO and President of Signal, Dick Marler.  (Tr. at 42, li. 7-10). Mr. Schnoor was responsible for the overall operation of the business unit, the production workforce, the upgrading of facilities, the buying of assets, major personnel decisions, and the outsourcing of work.  (Tr. at 42, li.22 - 43, li. 10; 44, li. 3-16).   He had authority to enter

contracts on behalf of the company.  (Tr. at 43, li. 22-25).  Schnoor had no knowledge

concerning the condition of the spud motor or the mooring arrangement and plan used prior to

the storm.  (Tr. at 111, li. 12-25; 112, li. 1-7).  Gene Rice was the Engineering Manager and the

Emergency Preparedness Manager.  (Tr. at 329, li. 9; 331, li. 2).  He was not aware of the

condition of the spud motor or the manner in which the barges were moored. (Tr. at 352, li. 2-

14).  Bill Bingle was the Production Manager, and he reported to Mr. Schnoor.  (Tr. at 410, li.

23; 411, li. 6).  Bingle was responsible for making sure that the hurricane plan was carried out,

making sure that revisions were made when changes were made in the yard, and keeping

everyone informed of changes in weather.  (Tr. at 413, 10-14).  William Tanner was the rigging

department manager, and he reported to Bill Bingle.  (Tr. at 524, li. 13; 411, 9-10; 457, 7-10; 43,

17-19).  Bingle and Tanner were aware that the spud motor was not functioning and that the

spuds could not be used due to the obstruction under the bridge.  (Tr. 440, li. 15-20; 460, li. 8-23;

470, li. 10-13).  Tanner gave some instructions on the way that the barges should be moored, but

neither he nor Bingle saw the actual manner in which the barges were tied.  (Tr. at 542, li. 3-6;

545, li. 3-546, li. 9; 455, li. 15-20).  Tanner and Bingle do not have authority to bind the

company through contracts. (Tr. at 43, li. 22-2).  The testimony of Bingle and Tanner indicates

that Bingle closely supervised Tanner and the rigging department, particularly since Tanner was

constantly consulting with Bingle during the hurricane preparations.  The testimony presented at

trial demonstrates that Tanner was not a managing agent.  As for Bingle, he was instructed by his

superior, Schnoor, to make the hurricane preparations and implement the hurricane plan.  There

is no evidence before the Court regarding whether Bingle had the authority to hire and fire

employees, his authority to set prices, or his authority over the payment of expenses.  However,

Schnoor testified that Bingle did not have the authority to enter contracts on behalf of Signal, and Schnoor's testimony that he was responsible for the overall operation of the business unit indicates that he, not Bingle, had authority to make basic business decisions involved in running the company.  Therefore, the managing agent for the rigging department was Schnoor, and he did not have any prior knowledge of the problems encountered when attempting to moor the barges. Additionally, the knowledge possessed by Bingle and Tanner cannot be imputed to Signal because they did not have the autonomy necessary to make them managing agents.  In the opinion of the Court, Signal has met its burden of proof that it lacked privity or knowledge.  As a result, Signal is entitled to limit its liability to the value of the barges post-accident.

The Value of the Barges

Signal's marine surveyor, Michael Schiehl, determined that the value of *Miss Tiff* and her ringer crane was $1,146,000.  (Tr. at 659, li. 3-5).  He determined that the actual value of *Jack King* and her crane was $387,400.  (Tr. at 658, li. 25 - 659, li. 2).  MDOT did not conduct a survey of the barges but relies on Gene Rice's testimony that the cost of rebuilding the *Miss Tiff* would be $5,000,000.  (Tr. at 1065, li. 13-24; 363, li. 13-20).[15]  The Court finds that the fair market value of the barges, not their replacement value, is the proper value to place on the barges for purposes of this limitation of liability action.  *See, e.g., Standard Oil Co. v. S. Pac. Co.*, 268 U.S. 146 (1925) (using market value as the measure of damages for a lost vessel); *In the Matter of the Am. Milling Co.*, 409 F.3d 1005, 1021-22 (8th Cir. 2005) (using the fair market value and actual sale price of the vessel); *In the Matter of the Compl. of Bankers Trust Co.*, 658 F.2d 103,

---

[15] Signal has filed a Motion in Limine [48] seeking to exclude Rice's testimony because it pertains to the replacement value of the barges.  That motion is moot because fair market value must be used in determining the value of the barges.

106 (3d Cir. 1981) (determined fair market value of the vessels by looking at contemporaneous sales of like property).  Therefore, MDOT is entitled to damages in the amount of $1,533,400.[16]

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Mississippi Department of Transportation is entitled to a judgment against Signal International, LLC, in the amount of $1,533,400.

**SO ORDERED AND ADJUDGED** this the 15th day of July, 2008.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

---

[16] Signal filed a Motion in Limine [49] asking the Court to exclude evidence regarding MDOT's assertion that it was entitled to damages for the loss of use of the highway.  That motion is moot since MDOT's other damages exceed the value of the barges.

-21-